**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Chambers of
Matthew J. Maddox
United States Magistrate Judge
MDD_MJMChambers@mdd.uscourts.gov




101 West Lombard Street
Chambers 3B
Baltimore, Maryland 21201
(410) 962-3407

March 31, 2023

TO ALL COUNSEL OF RECORD

Re: *Pamela B. v. Kijakazi*
Civil No. MJM-21-2631

Dear Counsel:

On October 14, 2021, Plaintiff Pamela B. commenced this civil action seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA," "Defendant") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. (ECF 1). Pending before the Court are Plaintiff's Motion for Summary Judgment (ECF 11) and Defendant's Motion for Summary Judgment (ECF No. 12).[1] I have reviewed the pleadings and the record in this case and find that no hearing is necessary. Loc. R. 105.6. (D. Md. 2021).

The Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed. 42 U.S.C. §§ 405(g), 1383(c)(3); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020). Under this standard, Plaintiff's motion will be denied, Defendant's motion will be granted, and the SSA's decision will be affirmed.

## I. Background

Plaintiff filed her application for DIB and SSI in 2017, alleging disability beginning on April 5, 2015. (R. 12, 165). Plaintiff's application was initially denied on June 13, 2017, and the initial determination was affirmed upon reconsideration on October 26, 2017. (R. 187–92, 200–203). Thereafter, Plaintiff requested an administrative hearing, and Administrative Law Judge ("ALJ") Deanna L. Sokolski held a video hearing on September 16, 2019. (R. 66–109). Plaintiff, who was represented by counsel, testified at the hearing. (R. 72–98). An impartial vocational expert also appeared and testified. (R. 99–108). The ALJ issued an unfavorable decision on

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 5).

October 1, 2019. (R. 162–80). The Appeals Council issued a remand order on June 22, 2020, directing the ALJ to "[g]ive further consideration to the [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide a rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p)." (R. 181–84). "In so doing," the ALJ was directed to "evaluate the treating source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927, and explain the weight given to such opinion evidence." (*Id.*)

On remand, ALJ F.H. Ayer held a telephone hearing on January 12, 2021. (R. 33–65). Plaintiff, who was represented by counsel, testified at the hearing. (R. 40-41, 52–59). An impartial vocational expert also appeared and testified. (R. 41–50, 60–5). Following the hearing, ALJ Ayer issued a decision dated February 28, 2021, finding Plaintiff not disabled. (R. 9–26). The Appeals Council denied Plaintiff's request for review August 19, 2021, and the ALJ's decision became the Commissioner's final decision. (R. 1–5). Plaintiff then commenced this civil action seeking judicial review under 42 U.S.C. § 405(g).

## II. <u>The SSA's Decision</u>

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining Plaintiff's disability claims, the ALJ followed the five-step sequential evaluation of disability set forth in 20 C.F.R. § 416.920.

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

*Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

If the first three steps do not yield a conclusive determination of disability, the ALJ then assesses the claimant's residual functional capacity ("RFC"), "which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Id.* at 635 (quoting 20 C.F.R. § 416.945(a)(1)). The ALJ determines the claimant's RFC by considering all of the claimant's medically determinable impairments, regardless of severity. *Id.* The claimant bears the burden of proof through the first four steps of the sequential evaluation. *Id.* If she makes the requisite showing, the burden shifts to the SSA at step five to prove "that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting 20 C.F.R. §§ 416.920, 416.1429).

When mental impairments are alleged, the ALJ must apply the "special technique" to determine the severity of the mental impairments. 20 C.F.R. § 404.1520a. The ALJ is required to rate the limitations in four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself (known as "paragraph B criteria" for mental disorders). *Id.* § 404.1520a(c)(3). The ALJ uses a five-point scale to rate a claimant's limitations in these functional areas: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). The rating is based on the extent to which the claimant's impairment "interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 404.1520a(c)(2). If rating of a limitation is "none" or "mild," then the ALJ generally concludes that the mental impairment is not severe. *Id.* § 404.1520a(d)(1).

In this case, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 5, 2015. (R. 15). At step two, the ALJ found that Plaintiff had the following severe impairments:

> [A] mental impairment variously diagnosed as depression NOS, grief reaction, major depressive disorder, depression, anxiety, generalized anxiety disorder, bipolar disorder, bipolar 1 disorder; obesity; asthma; left knee patellofemoral syndrome; allergic rhinitis; left foot plantar fasciitis; and right knee osteoarthritis, sprain, Baker's cyst, chondromalacia, patellar tendinopathy/tendinitis, partial anterior cruciate ligament tear, medial and lateral menisci myxoid changes status post arthroscopic surgery in September 2018 and February 2020.

(*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16). Then, the ALJ found that Plaintiff had the RFC to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b):

> The claimant has the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and never climb ladders, ropes and scaffolds. She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. and all exposure to hazards (machinery, heights, etc.). She requires the ability to alternate between sitting and standing about every 30 minutes such that sitting would total about 2 hours and standing and/or walking would total about 6 hours in an 8-hour workday. She is limited to performing simple 1-4 step, routine, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors and no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on

an assembly line.

(R. 1075). At step four, the ALJ found that Plaintiff is capable of performing past relevant work as a mail clerk, and this work did not require the performance of work-related activities precluded by her RFC. (R. 24). Additionally, at step five, the ALJ found, based on testimony from a vocational expert (VE), that Plaintiff was capable of performing other work in the national economy, including hand bander, inspector and hand packager, as well as cleaner polisher (R. 26). Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act. (R. 26).

## III. Standard of Review

The Court reviews an ALJ's decision to ensure that the ALJ's findings "are supported by substantial evidence and were reached through application of correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (internal quotation marks and citations omitted). In accordance with this standard, the Court does not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal brackets and citations omitted). Instead, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Id.* (citation omitted).

## IV. Discussion

Plaintiff challenges the ALJ's assessment of her RFC. Specifically, Plaintiff argues that the ALJ erred in determining the RFC with respect to both her physical and mental limitations.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The RFC assessment represents the most a claimant can do despite any physical and mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). Thus, when an ALJ assesses a claimant's RFC, he is expressing it in terms of the claimant's maximum remaining ability to perform sustained work. *See* SSR 96-8p, 1996 WL 374184, at *2. The RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history; medical signs and laboratory findings; treatment records; reports of daily activities; lay evidence; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *See* SSR 96-8p, 1996 WL 374184, at *5. But age and body habitus are not factors in assessing RFC. *Id*. at *1. "In performing this assessment, an ALJ 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations).'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (citing *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)). "In other words, the

ALJ must both identify evidence that supports [their] conclusion and 'build an accurate and logical bridge from [that] evidence to [their] conclusion.'" *Id*. (citing *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

**A. ALJ's Assessment of Plaintiff's Physical RFC**

With respect to Plaintiff's physical limitations, the record shows that Plaintiff was under the medical care and treatment of her primary care physician, Vanessa Allen, M.D., from September 2015 to October 2020. In 2015 and 2016, Plaintiff had issues with her left knee. Dr. Allen observed tenderness to palpation in the left knee, increased pain with movement, and painful varus and valgus stress test but normal tone, strength, and range of motion. (*See*, *e.g.*, R. 512, 528). Dr. Allen prescribed Tylenol as needed for pain and referred Plaintiff to physical therapy for left knee patellofemoral syndrome. (*See*, *e.g.*, R. 512–13). In March 2017, Plaintiff's musculoskeletal examination showed normal tone, strength, and range of motion, no instability or tenderness, no focal neurologic deficits, and gait within normal limits. (R. 504).

In early 2018, Plaintiff complained of all-day pain in her left heel that was worse upon standing in the morning. (R. 649). Her musculoskeletal examination was normal except there was left heel tenderness with palpation of the calcaneus and plantar fascial insertion. (R. 651, 654). Her gait was within normal limits. (R. 651). Dr. Allen diagnosed Plaintiff with left foot plantar fasciitis and administered a plantar fascia steroid injection. (R. 651, 654). She administered a second injection several months later. (R. 668). Dr. Allen noted left heel tenderness through mid-2019 but it was not affecting the Plaintiff's gait. (*See*, *e.g.*, R. 675).

In May 2018, Plaintiff complained about her right knee. Dr. Allen documented tenderness to palpation but full range of motion, and Plaintiff's gait was within normal limits. (R. 657). Dr. Allen administered a steroid injection. (R. 660). X-rays showed mild degenerative changes (R.602), and an MRI demonstrated tricompartment osteoarthritis most severe patellofemoral compartment; focal articular cartilage loss lateral femoral condyle; myxoid changes in both medial and lateral menisci without tear; partial tear femoral attachment anterior cruciate ligament; tiny Baker's cyst; and tendinopathy patellar tendon without tear. (R. 603). In July 2018 Plaintiff was examined by an orthopedist, Scott Berkenblit, M.D., who observed right knee tenderness, mild crepitance, no swelling or effusion, and positive McMurray and patellofemoral grind test. (R. 622). In September 2018, Plaintiff underwent right knee arthroscopy, and she was feeling better the following month but had occasional pain. (R. 624). Examination showed mild tenderness at the surgical site but there was no swelling and Plaintiff had full range of motion. (R. 624). Plaintiff was prescribed Norco and referred to physical therapy. (*Id*.)

In October 2019, Plaintiff saw orthopedic surgeon Olumuyiwa Paul, M.D. for evaluation of right knee pain and reported that "she has been experiencing pain along the anterior and posterior aspects of the knee for over a year." (R. 718). Plaintiff described "the pain as being constant in nature" and "aggravated with prolonged sitting as well as ambulation." (*Id*.) Dr. Paul observed antalgic gait, moderate right knee effusion, right knee tenderness and crepitus, positive patella grind, and some limitation of right knee range of motion. (R. 719). Dr. Paul also examined

Plaintiff's left knee documenting left knee effusion, tenderness, minimal crepitus, positive patella grind, and extension flexion of 0-125 degrees. (*Id.*) Since Plaintiff was already on ibuprofen, Dr. Paul recommended steroid injections. (*Id.*) Despite medication and a series of injections, Plaintiff's right knee pain persisted. During her visit in December 2019, Plaintiff reported that "she continues to experience pain along the anterolateral aspect of the knee with activity including standing as well as with ambulation…. [S]he has also been experiencing episodes of locking and instability occurring periodically while walking." (R. 720). On January 29, 2020, Plaintiff again reported right knee pain. She told Dr. Paul that the pain was "constant but worse with weight-bearing." (R. 724). She also reported "pain when walking up steps." (*Id.*) Plaintiff complained about "stiffness when she stands from a seated position" but also "episodes of locking occur at times when she attempts to stand from a sitting position." (*Id.*) Dr. Paul advised Plaintiff to consider arthroscopy and explained to her that the surgery "will be primarily directed to her complaints of episodic locking." (R. 725). Plaintiff underwent another right knee arthroscopy in February 2020. (R. 737–41).

After the surgery, Plaintiff visited Dr. Allen several times in 2020 for unrelated issues, and there is no evidence that she complained about her knees during those visits. During a visit on October 6, 2020, Plaintiff reported that she was "exercising regularly." (R. 707). On October 20, 2020, during her well visit, Plaintiff denied having any of the following conditions: arthritis, joint pain, gout, back problems, deformities, joint stiffness, muscle cramps, muscle stiffness, paralysis, restricted motion, and weakness. (R. 710). Moreover, Dr. Allen observed no musculoskeletal issues:

> Upon inspection, the alignment of the major joints and spine is symmetrical. There are no deformities or misalignment of bones. There are no ecchymosis, erythema, lacerations, subcutaneous nodules, or signs of muscle atrophy. Upon palpation there is no edema, effusions, temperature changes, tenderness or crepitus. The boney landmarks are normal and there is physiologic continuity of the anatomic structures. Range of motion testing reveals no restriction or instability rele1ted to ligamentous laxity. Muscle strength testing is 5/5 in all major muscle groups. Special testing of the joints for range of motion, nerve compression, and joint contracture is within normal limits.

(R. 711). Dr. Allen also observed normal gait.[2] (*Id.*) Plaintiff saw Dr. Allen in November 2020 for an unrelated issue, and she did not report any problems with her knees. (R. 713–15). The record does not include any opinions from Dr. Allen.

The ALJ also summarized Plaintiff's January 2021 hearing testimony, as follows:

---

[2] The ALJ noted that "despite [Plaintiff's] obesity and other impairments, the medical record does not document significant difficulty moving about and her gait was frequently within normal limits except in the months prior to her February 2020 right knee arthroscopy." (R. 20).

> She still has knee pain every day. She has problems going up and down stairs and if she sits or stands too long. She can stand for 30 minutes before sitting down. If she sits too long she can barely stand up. She can alternate sitting and standing for an hour and a half before stretching her legs or lying down. She can walk half a block. She can lift 10 pounds. She has carpal tunnel. She had carpal tunnel surgery before she stopped working.

(R. 18–19).

Plaintiff argues that the ALJ failed to explain the finding that she "could 'stand and/or walk about 6 hours in an 8-hour workday' as well as how Plaintiff 'requires the ability to alternate between sitting and standing about every 30 minutes such that sitting would total about 2 hours and standing and/or walking would total about 6 hours in an 8-hour workday.'" (ECF 11-1 at 14–17; ECF 15 at 2–5). Relying on her testimony and Dr. Paul's treatment record of her visit on January 29, 2020, Plaintiff argues that the "sit/stand option of alternating every 30 minutes" would "amount to 4 hours of standing in an eight hour workday." (ECF 15 at 4). If so, according to Plaintiff, she would be automatically found disabled as of her 50th birthday, November 2, 2018. (*Id.*)

Plaintiff's argument misses the mark. The ALJ adequately summarized and considered the medical and non-medical evidence concerning her lower extremities. For instance, the ALJ discussed the medical record concerning Plaintiff's left heel, left knee, and right knee, including details of observations and treatments from her primary care physician (Dr. Allen) and specialists (Dr. Berkenblit and Dr. Paul). (R. 18–20). The ALJ noted that Plaintiff was prescribed medication, injections, and then underwent right knee arthroscopy twice. (*Id.*) The ALJ also commented on Plaintiff's testimony and other statements. (*Id.*)

While acknowledging Plaintiff's testimony in January 2021 that "she continues to experience right knee pain and has difficulty sitting, standing, and walking for long periods," the ALJ specifically pointed out that "Dr. Allen's October 2020 physical examination did not show significant musculoskeletal or neurological abnormalities." (R. 20). Indeed, the record does not include any medical evidence suggesting that after the second arthroscopy in February 2020, Plaintiff continued to experience right knee pain or had difficulty sitting, standing, and walking. Still, the ALJ included a sit/stand option in Plaintiff's RFC, which appears to be primarily based on her testimony that she needs to change positions between sitting and standing throughout the day.

Plaintiff argues that the "sit/stand option" would "amount to 4 hours of standing in an eight hour workday," not "6 hours in an 8-hour workday," as the ALJ concluded. (ECF 15 at 2, 4, quoting R. 17). However, the ALJ expressed the concern that Plaintiff's statements regarding the effects of her symptoms are "not entirely consistent with the medical evidence and other evidence in the record." (R. 19-20). And Plaintiff has not met her burden of proof by identifying any medical evidence to support a more stringent limitation. Although Plaintiff testified that "she needs to lie down or elevate her legs during the day," the ALJ pointed out that the objective medical evidence

does not support her testimony, and Plaintiff again fails to cite any medical evidence on her needs to lie down or elevate her legs.

In sum, the ALJ's physical RFC assessment is supported by substantial evidence.

**B. ALJ's Assessment of Plaintiff's Mental RFC**

As to Plaintiff's mental limitations, the record shows that in September 2015, she complained of depression to Dr. Allen, who observed a moderately anxious mood, a moderately depressed mood, and a mood congruent affect. (R. 531–32). Plaintiff was diagnosed with depression and was prescribed Zoloft. (R. 532). The following month she reported that the medication was "helping a lot." (R. 526). In September 2016, Plaintiff reported increasing symptoms of depression and stating that she "isn't coping well and is having difficult[y] adjusting since death of [her] fiance." (R. 510). In March 2017, Dr. Allen noted moderate depression and moderate anxiety, and prescribed Zoloft and Wellbutrin. (R. 504).

Plaintiff began receiving treatment from psychiatrist Theodore Osuala, M.D. in October 2017. (R. 556). She complained of depression, sleep and appetite disturbance, crying spells, irritability, low energy, poor focus, isolating, suicidal ideations, anxiety, and feeling paranoid in crowded places. (*Id.*) Plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder, and she was prescribed medications. (R. 556). Dr. Osuala had changed her medications multiple times since then with some persistent symptoms but some reported improvement. From 2017 to 2020, Plaintiff was prescribed several medications such as Wellbutrin, Trazodone, Clonazepam, Lamictal, Latuda, Prempro, Montelukast, and Ambien. She did not report medication side effects apart from experiencing tremors while taking Abilify, which was then discontinued. Plaintiff reported hallucinations and some anxiety symptoms but also good focus, no suicidal ideation, no mood swings, and less racing thoughts with these medications.

Plaintiff first reported visual hallucinations on October 21, 2017. (R. 554). Later, around the middle of 2018, she reported auditory hallucinations. (R. 594). From September 2018 to February 2019, Plaintiff reported no hallucinations. (R. 578–96). During this period, it was generally noted that Plaintiff "appears to be making good progress," "doing well," and "making some progress." (*See*, *e.g.*, R. 578, 581, 585, 589). Then starting in March 2019, Plaintiff was "not doing well," and her diagnosis changed to generalized anxiety disorder and bipolar 1 disorder in April 2019. (R. 573). By September 2019, Plaintiff was reported "doing well," with no hallucinations or paranoia, but she reported that she had been "dealing with lots of death in the family." (R. 766). In November 2019, it was noted that Plaintiff was "not doing well with auditory hallucinations." (R. 765). From December 2019 to April 2020, Plaintiff was generally "making some progress but still [experiencing] some auditory hallucinations." (R. 758–63). From May 2020 to October 2020, she was "doing well" with "slight," "much less," and "minimal" auditory hallucinations. (R. 744–53).

On October 20, 2020, during her well visit with Dr. Allen, Plaintiff denied having any of the following mental conditions: depression behavioral change, disorientation, disturbing

thoughts, excessive stress, hallucinations, memory loss, mood changes, nervousness, or psychiatric disorders. (R. 710). Moreover, Dr. Allen observed no psychiatric issues:

> The patient is oriented to person, place, and time. Speech is fluent and words are clear. Thought processes are coherent, insight is good. There are no obsessive, compulsive, phobic or delusional thoughts; there are no illusions or hallucinations. Serial 7s accurate; recent and remote memory intact. The patient's fund of knowledge: awareness of current events and past history is appropriate for age. The patient's higher cognitive functions are intact; the patient can perform simple calculations and understands proverbs. The patient's mood is neutral and the affect appropriate; there are no loose associations.

(R. 711).

While the record does not include any opinion from Dr. Allen about Plaintiff's mental impairments, it does include a few reports from Dr. Osuala. In October 2017, Dr. Osuala opined that "Plaintiff can tolerate moderate work stress; she is likely to be absent from work about once a month; she has no physical limitations; she does not require additional rest periods, need to elevate the legs to hip level or above, or need to lie down during the day; she is not prevented from traveling alone; and her disability is temporary from October 21, 2017 to October 21, 2018." (R. 22, 546–49). In July 2019, Dr. Osuala completed a medical assessment form for Plaintiff's ability to do mental work-related activities in which he opined that Plaintiff "has fair or good ability to adjust to listed job tasks but would be absent about three times a month." (R. 23, 683–85). In August 2019, Dr. Osuala completed a medical assessment form for Plaintiff's mental status in which he opined that Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation. (R. 23, 686–88). Dr. Osuala further opined that Plaintiff had recurrent instances of inability to attend work as a result of limitations imposed by depression, anxiety, or other mental health manifestations and would be absent more than three times a month. (*Id.*)

Plaintiff has been receiving counseling services at PACE Consulting since 2014, and has been seeing Paula Anderson, LCPC, NCC, on a weekly basis since 2017. (R. 768). In December 2017, Ms. Anderson completed a medical assessment of mental status form in which she opined that Plaintiff "has marked difficulties in maintaining social functioning; and has deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner." (R. 23, 558–62). She also opined that "Plaintiff has recurrent instances of inability to attend work as a result of limitations imposed by depression, anxiety, or other mental health manifestations." Ms. Anderson described the manifestation as follows: Plaintiff "reported not wanting to get out of bed and feelings of great sadness as symptoms that hinder her ability to attend work." (*Id.*) Lastly, she opined that Plaintiff would be absent from work more than three times a month. (R. 562). In December 2017, Ms. Anderson completed a medical assessment of ability to

do mental work-related activities form. (R. 23, 563–65). The record also includes a letter, dated January 8, 2021, from Ms. Anderson, which states in part:

> [Plaintiff] has suffered from recurrent major depressive disorder for many years. Some of the symptoms of the disorder are feeling unrealistic anxiety, despair, hopelessness, chronic fatigue, irritability, lack of attention and concentration, inability to make decisions, and a general lack of interest towards life. Someone with recurrent major depression is more susceptible to having suicidal thoughts…. [Plaintiff] has experienced all the symptoms referenced above. She also experiences episodes where she sleeps for up to two days and has difficulty getting out of bed. She sometimes is unmotivated and does not want to leave her home. All of her symptoms make it extremely challenging for [her] to work a job. [She] has encountered a lot of trauma in her life, especially back-to-back losses of loved ones. In the situations where she encounters death of a friend or family member, it triggers her symptoms of recurrent major depression….

(R. 768). Ms. Anderson also stated that "even with treatment it's difficult for [Plaintiff] to function in many days. She had both good and not so good days … making it difficult for me to say that she has the capacity to work a job." (R. 769).

Plaintiff argues that the ALJ did not explain how "Plaintiff's impaired capacity to sustain concentration, persistence or pace could be accommodated by simply prohibiting her from 'fast pace or production quotas such as would customarily be found on an assembly line' type work." (ECF 11-1 at 18). Specifically, Plaintiff argues that the ALJ failed to properly account for paranoid ideation, auditory hallucinations, and visual hallucinations within the RFC determination. However, the ALJ did heed Plaintiff's claims that her mental impairments affect her ability to complete tasks and that she "experiences hallucinations, paranoia, and other mental health symptoms" (R. 17). The ALJ also pointed out that Plaintiff can "follow[] written instructions fine and spoken instructions ok," she consistently exhibited "fair" or "good" attention and concentration on mental status examinations, and, despite her symptoms, she was able to go out alone, drive, shop in stores, count change, pay bills, handle a savings account, and use a checkbook/money order. (R. 17). The ALJ further noted that "her psychiatric records document paranoid ideations but good impulse control and judgment." (R. 16–17).

The ALJ considered Plaintiff's testimony that she was in a deep depression and could not function, she spent 80 percent of her time in her room, she could not leave her house, she went to the store at 6 am to avoid people, she had panic attacks, she was unable to leave the house three times or more per week, she was more comfortable in her own space, she was paranoid, and she "sometimes hear[d] voices and s[aw] people" (R. 18). The ALJ noted Plaintiff's reports in the record of feeling paranoid in crowded places and experiencing auditory and visual hallucinations. (R. 21). The ALJ acknowledged that "paranoid ideations were noted during multiple examinations" and "auditory and visual hallucinations were also present," but there were "no illusions." (*Id.*)

In assessing Plaintiff's RFC, the ALJ summarized medical records from Dr. Allen and Dr. Osuala. Again, the ALJ acknowledged that Plaintiff complained about auditory and visual hallucinations and addressed this issue. For instance, when discussing the medications Dr. Osuala prescribed, the ALJ identified several prescription drugs that helped to improve Plaintiff's conditions and that she reported "hearing fewer voices, some anxiety symptoms, no depression symptoms, good focus, no suicidal ideation, no mood swings, and less racing thoughts." (*Id.*) The ALJ noted Plaintiff's mental status varied during the period that she was treated by Dr. Osuala. For example, "paranoid ideations were noted during multiple examinations" and "[a]uditory and visual hallucinations were also present but there were no illusions." (*Id.*) But the ALJ pointed out that "Dr. Osuala consistently observed that [Plaintiff] was alert and oriented with good memory, good impulse control, and good insight and judgment and her attention and concentration were fair or good." (*Id.*) Additionally the ALJ noted that Dr. Allen documented normal psychiatric examination findings. (*Id.*) Based on the medical and non-medical evidence, the ALJ concluded that:

> Overall, the medical record shows that the claimant's mental health symptoms improve with medication without reports of side effects except while taking Abilify for a short time. Although the claimant continues to experience symptoms despite medication, her residual symptoms would not prevent the performance of simple 1-4 step, routine, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, where there would only be occasional contact with co-workers and supervisors and no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on an assembly line. The claimant has not required emergency room treatment or hospitalization due to mental health symptoms. Examinations show that she has fair or good attention and concentration, intact or good memory appropriate intellectual functioning, coherent and logical thought process, and good insight and judgment but she experiences hallucinations and paranoia and frequently has abnormal mood and affect. Treatment records show that her hallucinations have decreased with medication but they still occur. Despite her symptoms, the claimant is able to care for her personal needs, prepare meals daily, clean the house and do laundry, go out alone, drive, go to church, shop in stores, count change, pay bills, handle a savings account, and use a checkbook/money orders.

(R. 21–22). Thus, contrary to Plaintiff's assertions, the ALJ accounted for Plaintiff's paranoid ideation, auditory hallucinations, and visual hallucinations in determining Plaintiff's RFC, and cited to substantial evidence to support the findings.

Plaintiff seems to suggest that the ALJ failed to follow the Appeals Council's instructions. The ALJ was directed to "[g]ive further consideration to the [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references

to evidence of record in support of assessed limitations" and to "evaluate the treating source opinions… and explain the weight given to such opinion evidence." (R. 181–84). As discussed above, the ALJ followed these instructions in that it considered both medical and non-medical evidence for the entire period at issue. The ALJ also provided a rationale and cited to supporting evidence. Additionally, the ALJ evaluated the reports and opinions from Dr. Osuala and Ms. Anderson, and explained why Dr. Osuala's 2017 report was given some weight while the other reports or opinions were given little weight. (R. 22–24). Therefore, Plaintiff's argument is unavailing.

## V. Conclusion

Because there is substantial evidence to support the ALJ's findings, and the findings were reached through application of the correct legal standards, Plaintiff's Motion for Summary Judgment (ECF No. 11) will be denied, and Defendant's Motion for Summary Judgment (ECF No. 12) will be granted. The SSA's decision will be affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

A separate Order will follow.

Sincerely,

/S/
Matthew J. Maddox
United States Magistrate Judge